IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:19-CR-276** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| | : | |
| **ADRIAN M. MOYE** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Before the court is Defendant's motion to suppress physical evidence and statements as well as a request to hold a *Franks* hearing. (Docs. 69, 97.) Defendant has moved to suppress a firearm that he argues was unconstitutionally seized by officers without a warrant in a narrow passage behind a private residence, and further, to suppress certain drug-related evidence on the basis that the underlying search warrants lacked sufficient probable cause. In addition, Defendant has moved to suppress an incriminating statement he allegedly made to officers following a second custodial interrogation after he had invoked his right to an attorney. After careful consideration, the court will deny the motion as to the physical evidence but grant the motion as to the statement.

## I.     BACKGROUND[1]

---

[1] Unless otherwise noted, the following factual account represent the facts the court credits upon consideration of the testimony and evidence presented during the evidentiary hearing held on July 6, 2023.

On August 20, 2019, shortly after 2:00 p.m., officers with the York City Police Department responded to a report of a shooting of a juvenile in the area of a three-unit row home located at 258 East Philadelphia Street, York, Pennsylvania. (Doc. 103 pp. 104-06.) Officers soon learned that Cassandra Dellinger lived in the first-floor unit of the building and that her boyfriend, Defendant Adrian Moye, stayed there occasionally. (*Id.* p. 63.)

Upon their arrival, officers found a seven-year-old boy, J.S., sitting on the front steps of the building with blood on his clothing and a small laceration on his face. (*Id.* p. 6.) Officers observed a discarded child's shirt and reflective vest on the ground nearby, as well as a significant amount of blood from the sidewalk leading to the porch and into the common vestibule of the building. (*Id.*) There was also blood on the door handle to the first-floor unit. (*Id.* p. 62.) Outside, Officer Andrew Shaffer encountered Ms. Dellinger, who told him that her five-year-old son, E.D., had been shot in the head and was being transported to the hospital. (*Id.* pp. 26-27.) Officer Shaffer advised Ms. Dellinger that he was concerned about the blood leading into her apartment and requested a key to enter, explaining that someone might be hurt inside. (Doc. 98 p. 3.) Ms. Dellinger declined his request. At that point, officers determined that exigent circumstances warranted a forced entry into the apartment to conduct a protective sweep for additional victims or a perpetrator. (*Id.* pp. 10, 61, 71.) The officers did not find anyone inside. (Gov. Ex. 14, at 2.)

Around 2:05 p.m., officers established a perimeter around the crime scene encompassing the sidewalk area in front of 258 East Philadelphia Street and adjacent properties. (*Id.* pp. 24, 26, 79.)

At approximately 2:18 p.m., Moye arrived at the hospital with the victim, who was pronounced dead. (*Id.* p. 14; Doc. 98 p. 1.) At that time, officers placed Moye under arrest and secured his vehicle, which had blood on both driver's side doors, large amounts of blood on the backseat, and what appeared to be brain matter on the driver's side rear window. (Doc. 103 pp. 70-71; Doc. 98 p. 5.) There was also a small hole above the driver's side rear passenger window. (Doc. 98 p. 5.)

Shortly after 3 p.m., York Police Detectives Kyle Hower and Tiffany Pitts attempted to question Moye about the shooting. (Doc. 103 pp. 105, 117.) After speaking briefly with the detectives, Moye stated that he wanted to talk to an attorney before he answered any additional questions. (*Id.* pp. 107, 117; Doc. 98 p. 6.) The interview ended at that time. (*Id.*)

Also around 3 p.m., Detective Chuck Crumpton went to the hospital to speak to J.S., who had been transported there for an evaluation of his head wound. (Doc. 98 p. 5.) After being evaluated, Detective Crumpton took J.S. to the Children's Advocacy Center for an interview, and then brought him back to the rear of 258 East Philadelphia Street to assist officers in locating the firearm used in the shooting.

(*Id.* pp. 5-6.)  Upon his arrival, however, J.S. "changed his mind and [said] the gun is in Moye's car." (*Id.* p. 6.)

At approximately 5:00 p.m., Detective Clayton Glatfelter directed law enforcement to canvass and search the exterior and perimeter of 258 East Philadelphia Steet for the firearm. (Doc. 103 pp. 40-41.) At approximately 5:05 p.m., Sergeant Jason Jay located a firearm with visible blood on the barrel in a narrow passageway behind the building and showed it to Detective Glatfelter. (*Id.* p. 55.) Sergeant Jay and Detective Glatfelter both testified that they did not disturb the gun prior to the search warrant being executed. (*Id.* pp. 20, 52.)

At approximately 6:10 p.m., a magisterial district judge executed search warrants for Moye's vehicle and Ms. Dellinger's apartment, and Detective Glatfelter seized the firearm in the narrow passage behind 258 East Philadelphia Street at 6:17 p.m. (*Id.* pp. 33, 37; Gov. Ex. 14 p. 2.) During the search of the apartment, officers recovered ammunition and observed what they suspected to be crack and powder cocaine. (Doc. 103 pp. 21-22.) Detective Perry then applied for and received a second warrant to seize the drugs and paraphernalia. (*Id.*) During the search of the vehicle, officers found a copper bullet jacket, gunshot residue, and a bullet fragment. (Doc. 98 p. 9.) York County charged Moye with various endangerment, gun, and drug-related offenses. (Doc. 103 pp. 108-09.)

Two days later, Detective Hower, who was the lead investigator in the case at the time, attempted once again to interrogate Moye about the shooting. However, Moye again asked for an attorney. (Doc. 103 pp. 109, 116; Gov. Ex. 17.) As they walked out to the elevator from the district attorney's office and chatted about a local minor league baseball team, Moye allegedly made the unsolicited statement: "I wasn't trying to hide that gun from you guys, I was just trying to keep [J.S.] from shooting himself." (Doc. 103 p. 115.)

In October 2019, a federal grand jury returned an indictment charging Moye with unlawfully possessing ammunition and a firearm as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 1.) A superseding indictment later added a third count for possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Doc. 89.) In May 2022, Moye filed a motion to suppress physical evidence and statements, and after new counsel was appointed, he filed a supplemental suppression motion in June 2023. The court held an evidentiary hearing on the motion during which Detective Clayton Glatfelter, Detective Christopher Perry, Sergeant (now Lieutenant) Jason Jay, and Detective (now Sergeant) Kyle Hower testified. The parties have filed post-hearing briefs, and the matter is now ripe for review.

## II.    <u>STANDARD OF REVIEW</u>

The Fourth Amendment to the United States Constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has repeatedly held, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967)).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–90 (1968)). The government, however, "bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). The relevant burden of proof is "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

In deciding a motion to suppress, the trial judge, as the fact finder, determines the credibility of the witnesses and the weight to be given to the evidence. *See Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974) (holding that "credibility determinations are uniquely the province of the fact-finder"). The court

can accept or reject a witness's testimony, assessing credibility on the following factors: demeanor and manner on the stand, ability to accurately recollect, impact of the outcome on the witness, whether the testimony supports or contradicts other evidence, and whether the testimony "withstands a common sense test of reason and logic." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005).

### III.  DISCUSSION

A. The firearm was legally seized.

Moye first seeks suppression of the firearm, arguing that it was found in the curtilage of the apartment building where he had a reasonable expectation of privacy and that the area was illegally searched, and the gun seized, prior to the issuance of the search warrant. (Doc. 111 pp. 6-8.) Moye's argument fails for two independent reasons.

First, the court finds credible the officers' testimony that the firearm was seized after the warrant was executed to search Ms. Dellinger's apartment and the building's curtilage. As Sergeant Jay testified, he observed the firearm in plain view as he stood in the backyard of a neighboring property located at 256 East Philadelphia Street. Moye had no protected privacy interest in that property, and officers were permitted to be there given the exigent circumstances and the need to

hold the scene until a warrant was obtained.[2] *See Kentucky v. King*, 563 U.S. 452, 462 (2011) ("Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."); *Illinois v. McArthur*, 531 U.S. 326, 332-33 (2001) (explaining that police can secure location for a reasonable amount of time while warrant is obtained); *United States v. Mitchell*, 175 F. App'x 524, 526 (3d Cir. 2006) ("[T]here is no doubt that the police had a right and, indeed, a duty to go to the [area] after receiving the report of the shooting. Then, when they saw blood on the sidewalk and on the front steps at [the residence], in view of their knowledge that there had been a shooting in the area, they were justified if not compelled to enter the premises immediately as they had a basis to believe that someone in the premises might be in imminent danger."). Contrary to Moye's argument, officers did not immediately seize the firearm but instead waited—out of an abundance of caution—to recover it until after they were notified that a warrant had been obtained. (Doc. 103 p. 19; *see also* Gov. Ex. 14, at 5 (warrant inventory listing seizure of firearm at 6:17 p.m.).) Because officers seized the firearm pursuant to a valid warrant, Moye's argument is meritless.

---

[2] As Sergeant Jay explained, officers were positioned in the backyard at 256 East Philadelphia Street because the yard was not enclosed and could be accessed from adjacent properties. (Doc. 103 p. 51; *see also id*. pp. 79-80 (Detective Perry providing a similar explanation).)

Second, even assuming the firearm was seized prior to the issuance of the warrant, there would be no Fourth Amendment violation because the narrow passage between the building and a neighboring property did not constitute the curtilage of the first-floor apartment.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn,* 480 U.S. 294, 301, (1987). "[T]he Court considers curtilage—'the area immediately surrounding and associated with the home'—to be 'part of the home itself for Fourth Amendment purposes.'" *United States v. Brooks*, 358 F. Supp. 3d 440, 466 (W.D. Pa. 2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (internal quotation marks omitted)). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 212–213 (1986).

In *Dunn*, the Supreme Court set forth four factors to resolve the curtilage question:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 480 U.S. at 301. The Court counseled that these factors represent "useful analytical tools" as opposed to a formula to be "mechanically applied." *Id*. The court begins its curtilage analysis with the *Dunn* factors.[3]

---

[3] Although the parties are familiar with the layout of the narrow passage, the court includes in its analysis two photographs presented by the government at the suppression hearing. Exhibit 10 is taken facing west on North Pine Street, which runs perpendicular to East Philadelphia Street. Exhibit 11 is taken facing east from the backyard of 256 East Philadelphia Street looking to North Pine Street:



GOVERNMENT
EXHIBIT
10



GOVERNMENT
EXHIBIT
11

*First*. The narrow passage lies immediately behind 258 East Philadelphia Street, and therefore it could potentially be treated as an adjunct of the house.

*Second*. At the time of the search, the narrow passage was enclosed on three sides by exterior walls and a chain link fence but was accessible from the backyard of 256 East Philadelphia Street. Although this entrance was partially blocked by a combination of trees and wooden planks, officer bodycam footage presented at the evidentiary hearing demonstrated that it was navigable on foot and accessible for anyone with access to the backyard of 256 East Philadelphia Street.

*Third*. It is evident that the narrow passage was not being used for intimate activities of the home. Instead, the area appeared not to be utilized by anyone, as it was covered with overgrown weeds and discarded debris. As Detective Perry explained, the passage was effectively a "no man's land." (Doc. 103 p. 84.)

*Fourth*. There was little to protect the passage from observation as it could easily be viewed from North Pine Street and the backyard of 256 East Philadelphia Street.

Thus, on balance, the *Dunn* factors suggest the narrow passage is not within the curtilage of the home and thus does not warrant Fourth Amendment protection. In addition, 258 East Philadelphia Street is a multi-unit building and, presumably, all tenants of the building enjoyed access to its backyard and the adjoining passage, thus further undermining any reasonable expectation of privacy. *See United States*

*v. Acosta*, 965 F. 2d 1248, 1257 (3d Cir. 1992) (finding tenants of a multi-unit dwelling lacked a legitimate expectation of privacy in the residence's backyard); *United States v. Correa*, 653 F.3d 187, 192–92 (3d Cir. 2011) (finding no privacy expectation in indoor common areas of a multi-unit apartment building). Clearly, the narrow passage had no relation with "those intimate activities associated with domestic life and the privacies of the home," and thus, cannot be classified as the curtilage of the first-floor apartment. *Dunn* 480 U.S. n. 4.

B. <u>The warrants did not omit facts or include false statements material or necessary to the finding of probable cause.</u>

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement in, or the omission of material information from, a search-warrant affidavit." *United States v. Bagley*, No.14-cr-098, 2015 WL 5725112, at *11 (W.D. Pa. Sept. 29, 2015), *aff'd*, 674 F. App'x 169 (3d Cir. 2017). When a defendant makes an appropriate showing, he is entitled to an evidentiary hearing to challenge the truthfulness of factual statements present in an affidavit of probable cause supporting a search warrant. *United States v. Yusaf*, 461 F.3d 374, 383 (3d Cir. 2006). However, "[t]he right to a *Franks* hearing is not absolute. Rather, the defendant must first (1) make a substantial preliminary showing that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are necessary to the finding of probable cause." *United States v. Romeu*, 433 F. Supp. 3d 631, 645

(M.D. Pa. 2020) (internal quotation marks omitted) (quoting *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012)).

Moye argues that the initial warrant application omitted the following material facts: (1) a firearm had been located outside of the apartment, (2) officers did not observe blood or any signs of a shooting during their initial protective sweep, (3) the door to the apartment had to be forced open because Moye did not have a key at the time of the shooting; (4) when interviewed, J.S. did not suggest that Moye had entered the apartment at the time of the shooting or left a gun inside the apartment; and (5) J.S. also stated that when Moye could not enter the front door, he went to the back door, which was also locked. (Doc. 98 pp. 17-18.). Moye also asserts that the affiant deliberately misstated which side of the vehicle the bullet hole and brain matter were located. (Doc. 111 p. 10.) The application indicated that those items were located on the passenger's side, but they were in fact located on the driver's side. (Gov. Ex. 15; Doc. 98 p. 21; Doc. 103 pp. 70-71.) According to Moye, because the bullet hole and brain matter were on the driver's side, it was less likely that someone shot into the vehicle from 258 East Philadelphia Street. (Doc. 98, at 21.)

Even accepting, *arguendo*, that the affiant knowingly or recklessly included a false statement or omitted material facts, there is no basis to conclude that the false statement or omitted facts were "necessary to the finding of probable cause." *Pavulak*, 700 F.3d at 665.

First, had the affiant stated that a firearm was found behind the building, probable cause still would have existed for the residence based on the need to locate additional evidence related to the shooting. (Doc. 103 pp. 69-70; Gov. Ex. 14, at 1.) Additionally, at the time the officers applied for the warrant, they did not know if the firearm found in the narrow passage was indeed associated with the shooting under investigation. (Doc. 103 pp. 70, 93.) Likewise, the fact that officers did not recover evidence during the protective sweep has no bearing on the probable cause determination. As Detective Perry testified, officers performed a rapid protective sweep to locate a potential suspect or victim rather than to search for forensic evidence. (*Id.* pp. 102-03.)  Further, Moye's apparent inability to enter the residence has no bearing on probable cause as the warrant application clearly established that there was blood leading directly into the apartment, that Moye arrived at the hospital with the five-year-old victim, and that Moye occasionally resided at the apartment. (Gov. Ex. 14 p. 2.) These facts easily established probable cause.

It is also immaterial that the warrant application mistakenly, or even "recklessly," indicated that the bullet hole and brain matter were found on the passenger's side of the vehicle rather than on the driver's side. (Doc. 111 p. 12.) Contrary to Moye's argument, probable cause to search the residence was not based on the supposition that someone fired a gun from 258 East Philadelphia Street but rather on the obvious evidence that a shooting occurred in the area, that blood was

found leading into the apartment, and that both the victim and suspect resided in the apartment.

When examining whether probable cause existed for issuing a search warrant, "[a] reviewing court must determine only that the magistrate judge had a substantial basis for concluding that probable cause existed to uphold the warrant." *United States v. Whitner*, 219 F. 3d 289, 296 (3d Cir. 2000) (internal quotation marks and citation omitted). Even if the alleged deficiencies had been addressed, the probable cause determination would have been the same based on the information supplied to the magistrate district judge. *See Yusuf*, 461 F.3d at 389-90 ("That determination does not require absolute certainty that evidence of criminal activity will be found at a particular place, but rather that it is reasonable to assume that a search will uncover such evidence.") Accordingly, Moye has failed to demonstrate that the false statement or omitted facts were necessary to the finding of probable cause and, therefore, the court will decline to hold a *Franks* hearing.

C. The Sixth Amendment prohibits the use of Moye's statement made after he invoked his right to an attorney.

Finally, Moye seeks to suppress the incriminating statement he allegedly made to Detective Hower on August 22, 2019, that "I wasn't trying to hide that gun from you guys, I was just trying to keep [J.S.] from shooting himself." (Doc. 98 at 22.) Moye claims the statement resulted from a custodial interrogation in violation of his Sixth Amendment right to counsel, while the government argues that the

16

statement did not violate the Sixth Amendment as it was spontaneous and unsolicited. (Doc. 106 pp. 21-22.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "[T]he right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (internal quotation marks and citations omitted). "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Rather, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.* Exclusion is the typical remedy for a Sixth Amendment violation. *Massiah v. United States,* 377 U.S. 201, 207 (1964). As the Supreme Court has explained, "an individual who stands indicted of a crime is denied his right to counsel when agents of the state circumvent that right by deliberately eliciting inculpatory statements from him in the absence of his counsel, absent a voluntary and knowing waiver." *Dellavecchia v. Sec'y*

17

*Pennsylvania Dep't of Corr.*, 819 F.3d 682, 693 (3d Cir. 2016) (internal quotation marks and citations omitted).

In the seminal Sixth Amendment case *Brewer v. Williams*, 430 U.S. 387 (1977), involving the Christmas Eve murder of a young girl in Des Moines, Iowa, the Supreme Court analyzed whether, under the facts presented, the respondent, Williams, had been denied his Sixth Amendment right to the assistance of counsel. Two days after the girl disappeared, Williams, on the advice of his counsel, turned himself into police 160 miles from Des Moines. As he was being transported back to Des Moines, a detective delivered what would be later known as the "Christian burial speech." The detective, who knew that Williams was a deeply religious man, said:

> I want to give you something to think about while we're traveling down the road. Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas (E)ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.

*Brewer*, 430 U.S. at 393. Following this speech, Williams revealed the location of the body.

The Supreme Court held that William's Sixth Amendment right to counsel had been violated. The Court explained that "[a]t no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney. Instead, he stated several times that '[w]hen I get to Des Moines and see [my attorney], I am going to tell you the whole story.'" *Id.* at 392. Nonetheless, the detective "deliberately and designedly set out to elicit information from Williams," and "purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." *Id.* at 399.

In a subsequent Sixth Amendment case and in contrast to *Brewer*, the Supreme Court found that where the defendant's statements were "unsolicited" and "spontaneous," the right to counsel was not violated. *Kuhlmann v. Wilson*, 477 U.S. 436, 440 (1986). The Court explained that "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Id.* at 459 (citation omitted). Rather, to establish a violation, "the defendant must demonstrate that the police . . . took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*

In applying this Supreme Court precedent, the Third Circuit in *Dellavecchia* concluded that the Sixth Amendment was not violated where the police did not deliberately solicit a statement from the defendant while he was hospitalized for a self-inflicted head injury on the day following his arrest. *Dellavecchia*, 819 F.3d at 684. After introducing himself to a lieutenant in the hospital, the defendant, "unprompted and willingly" stated, "I really fucked up. . . . I want to tell you what happened." *Id.* at 688. Rather than eliciting a statement from him, the lieutenant advised the defendant that anything he said could be used against him, thus "in effect encourag[ing] him to remain silent." *Id.* The court explained that, although a defendant has a right to legal representation during an interrogation, "spontaneous and unprompted statements voluntarily provided to police may be used at trial where there has not been an interrogation," such as the one in *Brewer*. *Id.* at 695.

There is no question here that Moye was subjected to a second custodial interrogation without legal representation after he had been charged and after he had clearly indicated several times that he wanted an attorney. At the suppression hearing, the government introduced a video of the August 22, 2019, custodial interrogation at the York County District Attorney's Office. The video begins with Detective Hower leading Moye into an interrogation room and placing in front of Moye a large binder covered with an 8x10 photograph of a young smiling boy, presumably the victim in this case. Detective Hower states: "Like I said before, I

understand this is a mistake. Okay. And I know your heart is feeling heavy about it because you said you haven't slept for two days." (*Id.* 0:40-57.) He then provides Moye his *Miranda* rights and continues: "And the last time we talked . . . you said you wanted an attorney. You remember that. Okay. You remember before I talked to you, I gave you your *Miranda* rights. Do you wish to talk to me today without an attorney present because it's my understanding you haven't retained one yet." (*Id.* 1:31-1:53.) Moye explains that he is in the process of obtaining an attorney. (*Id.*) Detective Hower nevertheless persists, stating:

> I want you to be able to get your story out, okay. I know this was a mistake. You don't want this kid to die. [Ten-second pause.] This is weighing on you heavy. I understand that. I can't imagine what you are feeling right now. [Six-second pause.] We don't know each other at all from before right. I've never dealt with ya. I deal with everybody on face value, and I understand you had a rough life okay. I'm willing to put that behind us so we can figure out what happened. [Seventeen-second pause.]

(*Id.* 1:57-3:08.) Moye reiterates that he does not want to speak without an attorney and adds that he did not like the way he was treated on the day of his arrest. (*Id.* 3:20-3:45.) Undeterred, Detective Hower continues: "You understand it's a stressful situation and we are trying to figure out how a five-year-old died? Understand?" (*Id.* at 3:52-4:02). Moye says he is upset police perceive him to be a prime suspect, and Detective Hower responds, "[t]hat's what I want to talk to you about. Okay. But you want [your attorney here], alright." (*Id.* 4:22-4:30.) Soon afterward the interview

concludes and Detective Hower leads Moye out of the room to the elevator where Moye allegedly makes the incriminating, and unrecorded, statement at issue.

Unlike in *Dellavecchia* where the lieutenant did not go to the hospital with the intent to question the defendant, here there is no question that Detective Hower deliberately and designedly set out to elicit information from Moye after he had invoked his right to an attorney but before an attorney had been retained.[4] As in *Brewer*, Detective Hower purposely sought out Moye in the absence of counsel to obtain as much incriminating information as possible. He brought Moye into an interrogation room for a second time and placed a picture of the young victim in front of him. Knowing that Moye was in a vulnerable state and had not slept, Detective Hower then made emotionally charged, open-ended statements to encourage Moye to voluntarily speak without the assistance of counsel. His use of the photograph, his plea for Moye to "tell his story" about how "a five-year-old died," his use of elongated pauses, and his persistence, despite Moye's repeated unwillingness to speak without an attorney, clearly amounted to an interrogation in

---

[4] Hower testified in this regard as follows:

> Q: [W]hen you brought him back to be interviewed on the 22nd, you knew he had requested an attorney and you knew that he had not yet been able to retain an attorney?

> A: Yes, he requested one that day that I spoke with him. And to my knowledge, in speaking with the district attorney's office, he had not retained one yet at that point.

(Doc. 103 p. 119.)

the absence of counsel in violation of Moye's Sixth Amendment rights. Although the incriminating statement was made shortly after the formal interrogation had ended, the statement, while spontaneous, was a product of the interrogation as it would never have been made had Detective Hower not intentionally created a situation likely to induce Moye to speak in the absence of an attorney. As such, the government violated Moye's Sixth Amendment right to counsel, and the statement will be suppressed. *See United States v. Henry*, 447 U.S. 264, 274 (1980) ("By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the government violated Henry's Sixth Amendment right to counsel.").

## IV.   <u>CONCLUSION</u>

For the reasons explained above, Moye's motions to suppress evidence and his request for a *Franks* hearing will be denied.  However, his motion to suppress his statement will be granted. An appropriate order will issue.

<u>*/s/ Sylvia H. Rambo*</u>
SYLVIA H. RAMBO
United States District Judge

Dated: March 6th, 2024.